[No. G042041. Fourth Dist., Div. Three. May 7, 2010.]

MARIA LOURDES GUTIERREZ, Plaintiff and Appellant, v.
G & M OIL COMPANY, INC., Defendant and Respondent.

## COUNSEL

Spiro Moss and Gregory N. Karasik for Plaintiff and Appellant.

Littler Mendelson, Tony R. Skogen, Fermin H. Llaguno and Keith A. Jacoby for Defendant and Respondent.

## OPINION

**SILLS, P. J.—**

### I. INTRODUCTION

Our Supreme Court has held that in-house attorneys may state retaliatory discharge claims against their employers as long as such claims "can be established without breaching the attorney-client privilege or unduly endangering the values lying at the heart of the professional relationship." (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1169 [32 Cal.Rptr.2d 1, 876 P.2d 487] (*General Dynamics*).) It has also held that in-house attorneys come within the rubric of the attorney fee award provisions of Civil Code section 1717 (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084 [95 Cal.Rptr.2d 198, 997 P.2d 511] (*PLCM*)).[1]

---

[1] Civil Code section 1717 is a provision that allows the recovery of attorney fees to the prevailing party in actions on a contract. Subdivision (a) of the statute provides: "(a) In any

Today we face the related question of whether in-house attorneys come within the mandatory relief from default or dismissal provision of section 473 of the Code of Civil Procedure.[2] The question is, as far as we are aware, one of first impression in California. However, based on what the Supreme Court said in *General Dynamics* and in *PLCM* about the role of in-house attorneys, there can be no doubt about the answer: yes.

There is a wrinkle in this case, however, that requires a little more explication. Here, the in-house attorney who negligently allowed a $4 million default judgment to be taken against his company and his employer, a gas station chain, had the title of "Vice President and General Counsel." Thus, he was a corporate officer as well as being an in-house attorney. Should *that* make a difference?

We emphasize that we are, like the Supreme Court in *Trope v. Katz* (1995) 11 Cal.4th 274 [45 Cal.Rptr.2d 241, 902 P.2d 259] (*Trope*), dealing with the text of a statute. *Trope* held that attorneys representing themselves cannot obtain attorney fees under section 1717 because the *language* of section 1717 used words like "fees" and "incurred." (See 11 Cal.4th at pp. 279–280.) Such words revealed that the Legislature did not intend to allow attorneys representing themselves to obtain fees under section 1717. After all, attorneys representing themselves don't *incur* any *fees* to enforce a contract.

In the present case, we follow suit and similarly look to the language of the relevant statute, in this case section 473. And there is nothing in section 473 which suggests that in-house attorneys who are also officers of a corporation are somehow exempt from the operation of the mandatory provisions of the statute. The statute speaks of an "attorney's sworn affidavit attesting to his or her mistake" (*id.*, subd. (b)), et cetera, leading to a default, and makes no differentiation between attorneys who are corporate officers and those who are not.

---

action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract. [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit. [¶] Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void."

All undesignated references in this opinion to section 1717 are to the Civil Code.

[2] All undesignated references in this opinion to section 473 are to the Code of Civil Procedure.

Accordingly, this court would thus have to *read into* section 473 an implied exception for in-house counsel who double as corporate officers. *This case* however—this case of all cases—is particularly inappropriate for the judicial creation of such an implied exception: There is a distinction between corporate counsel who provide "strictly legal services" to a corporation, and corporate counsel who "step out" of their role as "legal advisor" and provide services of a "nonlegal business nature." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2009) ¶ 6.1.1, p. 6-1 (rev. # 1, 2009), italics omitted.) In this case, the in-house "general counsel" was *only* acting in his capacity as a lawyer, and providing *only* services of a legal nature, and was most certainly not acting in any role as a corporate officer. In fact—and in violation of his duty as a lawyer—he *concealed* the litigation from everybody else in the corporation. Because he was a lawyer, acting as a lawyer, there is no need for us to carve out, in this case, any implied exception in section 473 for in-house counsel who are also corporate officers. Here, because the in-house attorney was acting in his role as attorney, it is clear the trial court correctly set aside the default.

## II. BACKGROUND

In December 2006, Maria Lourdes Gutierrez filed a class action suit against G & M Oil Company, Inc., an operator of a chain of gas stations throughout California. The chain's stations include Chevron, Valero and Shell stations; in fact, G & M is, according to its Web site, one of the largest Chevron dealers in the nation. The company was founded by George Pearson who began by operating one gasoline station in Seal Beach in 1969, and, at least by 2008, remained "very much a family enterprise," still managed by Pearson and his family. According to points and authorities that would eventually be filed to obtain a default judgment, G & M has more than 125 gas stations, open all day and all night, and employs between four and seven cashiers at each station, who work shifts of eight hours. That works out, according to those points and authorities, to between 500 and 875 "full time equivalents." The word "equivalents" was presumably chosen because some cashiers may work more than one shift: We may thus presume that the company has upwards of 500 employees.

Gutierrez's class action suit alleged that G & M's employment policies toward its cashiers violated wage and hour laws. In particular, she alleged that the cashiers weren't paid for the time they spent counting money and closing out registers, and weren't given meal breaks required by law.

Michael Gray is part of Pearson's family, related to Pearson by Pearson's first marriage. Gray's father is, in fact, G & M's chief financial officer. Gray himself was the gas station chain's vice-president and general counsel, and had been so since 2001. At all times from March 2001 to January 2009 he was the registered agent for service of process for the company, and hence authorized to receive all pleadings and legal documents on its behalf. In fact, he had been the company's *only* in-house attorney since 2001, and would continue to be until January 2009.

In a conversation with Gutierrez's attorney, Gregory Karasik, on January 4, 2007, Gray agreed to accept service of the complaint by regular mail. Karasik mailed him a copy of the complaint that day.

After receiving the original summons and complaint, Gray decided to handle the defense of the case himself. He did not send a copy of the pleadings to any other officer, director, manager, or employee of the company, never talked to, or otherwise let on to anyone else at the company that it had been sued for alleged wage and hour violations. He kept it from, according to his declaration when read in conjunction with the firm's Web site, the fellow members of the Pearson clan who otherwise ran the company. Nor did any of his fellow officers, managers or family members find out about it. The litigation was his little secret.

Gray attended no fewer than two case management conferences over the next year, but Gray took no action to otherwise defend the case. Remarkably, the record contains no fewer than three separate requests for default: One filed on the original complaint on June 12, 2007, then another default request on September 10, 2007, in the wake of a first amended complaint, and finally a third default request, based on a lack of a response to the second amended complaint, on January 8, 2008.

In May 2008, default having been taken four months earlier, Gutierrez successfully sought an order requiring the company to provide the name and home address of every employee in Gutierrez's class—again served directly on Gray—and in August successfully obtained an order holding G & M in contempt for not providing the list. Gray did nothing to oppose that order, nor did he show up at the hearing, despite service of notice.

In September 2008, patience exhausted, Gutierrez's counsel requested entry of a default *judgment.* A judgment was obtained in early December 2008, for around $4 million.[3]

---

[3] The constituents were: About $1.3 million for unpaid minimum wages to all persons in the class; liquidated damages of another some $1.3 million; some $630,000 for unpaid overtime; and another $1 million for missed meal periods.

The $4 million class action default judgment was too much, even for Gray, who, in December 2008, finally brought it to the attention of George Pearson, the company's chief executive officer and founder. That was the first Pearson had ever heard of the case. Pearson immediately removed Gray from his position as general counsel and from his position as agent for service of process, and replaced him with an "outside attorney." Pearson then immediately retained a large law firm to defend the suit (the same firm represents G & M in this appeal), and authorized it to represent it in a mediation scheduled for March 2009.

That firm filed, in March 2009, a motion to vacate the default class action judgment, based on, among other things, Gray's declaration, relating many of the facts we have already recounted. The ninth paragraph of the declaration contains Gray's confession of neglect for letting the default judgment be taken: "The default judgment entered in this case was a result of my neglect alone. My actions and inactions in representing G & M Oil Company, Inc. that [led] to the entry of the default judgment in this lawsuit were taken without the knowledge or consent of Defendant G & M Oil Company, Inc.; and Defendant G & M Oil Company, Inc., is entirely blameless and without fault in this matter." In a reply declaration to Gutierrez's opposition to the set aside motion, Pearson would note that Gray never had any management responsibilities at the company; his sole job was to advise Pearson and act as agent for service of process.

The hearing was held in April 2009, resulting in a formal order filed May 2009 vacating the default judgment and allowing G & M to file an answer to Gutierrez's second amended complaint. Gray was also ordered by the court, "as a consequence of granting" the motion to set aside the judgment based on his affidavit of fault, to pay about $17,000 in attorney fees to Gutierrez's counsel. Gutierrez filed a timely notice of appeal from the order granting the motion to vacate the default judgment.[4]

## III.  DISCUSSION

### A.  *Do In-house Counsel Come Within Section 473? Yes*

The Governing Precedent

Some appellate cases, based on the "not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect" clause in the mandatory relief provision of section 473, have restricted the statute only to cases where the party against whom the judgment is taken is "totally innocent of any

---

[4] As an order after a final judgment, the set aside order was appealable.

wrongdoing and the attorney was the *sole* cause of the default or dismissal." (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1248 [92 Cal.Rptr.2d 322], original italics.)

By contrast, other Court of Appeal decisions have indicated that the provision is available to clients who may be at some fault in allowing the dismissal or default, just as long as the client is not guilty of intentional misconduct in contributing to the adverse result. (E.g., *SJP Limited Partnership v. City of Los Angeles* (2006) 136 Cal.App.4th 511, 520 [39 Cal.Rptr.3d 55] (*SJP Limited Partnership*) [because "the evidence does not support" a "finding of any intentional misconduct on" on the client's part, "we find that the trial court erred in not granting" the client "mandatory relief from dismissal"]; *Benedict v. Danner Press* (2001) 87 Cal.App.4th 923, 932 [104 Cal.Rptr.2d 896] [while client's mistakes "were an additional cause in fact of the entry of default," since those mistakes were not intentional, relief was properly granted].[5])

The case before us, however, does *not* implicate this split among the appellate courts. The issue of whether some quanta of blameworthiness on the part of the *client* that might otherwise disqualify it from relief under the mandatory provision of section 473 is not before us. There is nothing here to indicate that the client, G & M, was anything less than "totally innocent" of the causes for the eventual default judgment.

That is—*unless* you *impute* Gray's misconduct, as in-house attorney, to G & M, on the theory that he was a corporate officer, agent, or otherwise a company employee. And that is, of course, the centerpiece of Gutierrez's appeal. Gutierrez's theory is that, *as a matter of law*, Gray's conduct *was* his client's conduct, hence G & M is stuck with it, no matter how innocent the company might otherwise be.

We are aware of no published opinion directly dealing with the issue of whether in-house attorneys come within the mandatory relief provision of section 473. However, the Supreme Court has examined two closely related

---

[5] *Benedict* simply disagreed with the totally blameless language from *Lang*. (See *Benedict v. Danner Press, supra*, 87 Cal.App.4th at p. 930.) We simply observe that in *Lang*, the client's own conduct in not complying with discovery orders was itself described as "willful, tactical, egregious and inexcusable" (*Lang v. Hochman, supra*, 77 Cal.App.4th at p. 1247), so its "totally innocent of any wrongdoing" statement should, in context, be read as containing an implied understanding that "wrongdoing" means intentional conduct, not negligence. (*Benedict, supra*, 87 Cal.App.4th at p. 930.)

issues: May an in-house attorney sue a former employer for wrongful termination or retaliatory discharge? (*General Dynamics, supra*, 7 Cal.4th 1164.) And does an in-house counsel come within the attorney fee recovery provision of section 1717? (*PLCM, supra*, 22 Cal.4th at p. 1091.)

*General Dynamics*, the wrongful termination and discharge case, is an extended and nuanced disquisition on the role of in-house attorneys: Along the way the high court noted the "marked rise in the number and professional stature of so-called in-house or corporate counsel" (*General Dynamics, supra*, 7 Cal.4th at p. 1171), the "unusual pressures" they face to conform to their employer's goals not shared by outside counsel (*id.* at p. 1172), their complete economic dependence on their one client (see *id.* at p. 1188), and the necessity of preserving the attorney-client privilege if any claim for wrongful termination or retaliatory discharge were to be allowed (*id.* at pp. 1190–1191). Thus, in crafting a decision that allows former in-house attorneys to sue their erstwhile employers *qua employers*, the *General Dynamics* court was very careful to formulate rules so "the contours of the statutory attorney-client privilege should continue to be strictly observed." (*Id.* at p. 1190.)

The important thing about *General Dynamics* for our purposes is that there is no way one can read it without coming away with this basic thought: In-house attorneys employed as attorneys for their employer do indeed have an attorney-client relationship with their employers.

The second of the two analogous decisions, *PLCM*, bears extended discussion. There, an attorney requested a defense of a legal malpractice action against him from an insurance company.[6] The insurance company retained a defense firm that the attorney himself selected, and the case got settled. But a dispute arose over whether the attorney himself had to pay a certain amount of the defense firm's fees as a deductible. For his part, the attorney paid nothing toward the fees incurred defending the malpractice action against him and contended he did not owe anything to the insurer. There was, however, a reimbursement provision in his malpractice policy, a provision which had an attorney fees provision just in case the insurer had to bring suit to recover any money advanced that should properly have been paid by the insured as part of the deductible. The insurance company paid off the defense firm, and then assigned out its claim under the reimbursement provision for collection, and the collection firm then sued the attorney. (See *PLCM, supra*, 22 Cal.4th at pp. 1088–1089.)

---

[6] Technically, the plaintiff in the case was an insurance administrator for a group of legal malpractice insurers offering insurance through a county bar association. (*PLCM, supra*, 22 Cal.4th at p. 1088.) For convenience sake we will refer to this administrator broadly as an "insurance company."

But then the attorney cross-complained against the insurer for bad faith and related causes of action. The collection firm assigned the main claim back to the insurer, which became the plaintiff in the action, the attorney himself rejected any attempt to settle the case, and the case eventually went to trial, with the insurer represented by "in-house counsel employed by its parent company." (*PLCM, supra*, 22 Cal.4th at p. 1089.) The high court noted that the insurer was charged annually by that parent company "for a proportional share of the expenses of operating" the parent company's "law division." (*Id.* at pp. 1089–1090.)

The insurance company, represented by its parent firm's in-house law division, won the trial, and returned a verdict for the full amount of the claim, about $10,000. Then it sought an attorney fee award of about $61,000 under the reimbursement provision. The $61,000 figure was based on the "market rate . . . for attorneys of comparable experience." (*PLCM, supra*, 22 Cal.4th at p. 1090.) The insured attorney argued against any award on the theory that "attorney fees for in-house counsel could not be recovered." (*Ibid.*) The trial judge granted the fee request anyway.[7] The attorney repeated his argument to the appellate court, relying on *Trope, supra*, 11 Cal.4th 274, a decision that had held that attorneys representing themselves in propria persona could not recover attorney fees under section 1717. The appellate court rejected the argument, affirmed the award, and the Supreme Court granted review and affirmed as well. (We will have more to say about *Trope* in pt. III.B. of this opinion anon.)

We divine from *PLCM* the following three reasons the high court included an in-house attorney as a truly "independent third party" for purposes of whether a fee award could be made under section 1717:

One, in-house attorneys do not represent themselves, they represent third parties. Hence, the high court distinguished *Trope* on this very basis. The *Trope* case, said the *PLCM* court, was anchored in the theory that "by definition, the term 'attorney fees' implies the existence of an attorney-client relationship, i.e., a party receiving professional services from a lawyer." (*PLCM, supra*, 22 Cal.4th at p. 1092.) A lawyer representing himself, by contrast (besides having a fool for a client—writing for the court, Justice Mosk quoted *Trope*'s endorsement of the adage by noting it was the " ' "product of years of experience" ' "), does not have such a relationship. (*Id.* at pp. 1092–1093.) The point was that the in-house attorney does not represent himself, but has an agency relationship with the corporation he or she represents. (*Id.* at p. 1093 ["A corporation represented by in-house

---

[7] The amount, six times the disputed deductible, would ultimately be affirmed by the Supreme Court. There's a moral there somewhere.

counsel is in an agency relationship, i.e., it has hired an attorney to provide professional legal services on its behalf."].)

Two, treating in-house attorneys differently from outside attorneys for purposes of section 1717 would create an unfair differentiation in the law. The *PLCM* court observed that in the case of an attorney in pro se, the court's rationale in *Trope* was animated by the unfairness of allowing an attorney in propria persona to recover counsel fees when *nonattorney* litigants in propria persona could not. (See *PLCM, supra*, 22 Cal.4th at p. 1092, quoting & citing *Trope, supra*, 11 Cal.4th at pp. 285–286.) The underlying point again was that in-house attorneys, unlike attorneys in pro se, do not represent their own interests: "There is no problem of disparate treatment; in-house attorneys, like private counsel but unlike pro se litigants, do not represent their own personal interests and are not seeking remuneration simply for lost opportunity costs that could not be recouped by a nonlawyer." (*PLCM, supra*, 22 Cal.4th at p. 1093.)

Three, the analogy between in-house attorneys to outside attorneys on private retainers favors application of section 1717 to the in-house attorneys: "The fact that in-house counsel is employed [full-time] by the corporation does not alter the fact of representation by an independent third party. Instead, the payment of a salary to in-house attorneys is analogous to hiring a private firm on a retainer." (*PLCM, supra*, 22 Cal.4th at p. 1093.) In that regard, the court stated that both in-house counsel and outside counsel have the same "duties to their clients": "Both are bound by the same fiduciary and ethical duties to their clients." (*Id.* at p. 1094.)

Each one of these reasons applies just as much to the mandatory provisions of section 473 given the facts of this case. One: Here, the in-house attorney Gray was in an attorney-client relationship with G & M, and he was acting *as an attorney* in being the person responsible for handling Gutierrez's suit. Two: There is nothing in section 473 that suggests corporations or other business entities who elect to have an in-house lawyer represent them in litigation should be at some disadvantage vis-à-vis the negligence of their attorneys that would not apply when they elect to retain outside counsel. And three: Here, as in *PLCM*, both in-house and outside attorneys on retainer have the same duties to their—and this is *PLCM*'s and *General Dynamics*'s word—"clients." (See *PLCM, supra*, 22 Cal.4th at p. 1094 [both in-house and outside counsel "are bound by the same fiduciary and ethical duties to their clients"]; *General Dynamics, supra*, 7 Cal.4th at p. 1190 [emphasizing importance of preserving attorney-client privilege in context of wrongful discharge litigation].)

### B.   *Does It Make Any Difference That the In-house Attorney Was Also a Corporate Officer? Not Under These Facts*

■ Counsel for Gutierrez lays great stress that here Gray held the title of "vice president" of G & M. As he sees it, an in-house attorney and an employer-client are, legally speaking, one flesh when the in-house attorney is also a corporate officer.

Not so, for a number of reasons.

First, we must remember we are dealing with a statute, not common law. (Cf. *Trope, supra*, 11 Cal.4th at p. 288 ["Moreover, Trope & Trope has again framed its contention as if its claim for attorney fees were governed by common law and not by statute."].) The mandatory relief provision of section 473 is: "Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by *an attorney's* sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) *resulting* default entered by the clerk *against his or her client*, and which will result in entry of a default judgment, or (2) *resulting* default judgment or dismissal entered against *his or her client*, unless the court finds that the default or dismissal was not *in fact caused by* the attorney's mistake, inadvertence, surprise, or neglect." (Italics added.)

■ The italicized words show two things. One, the statute does not differentiate between attorneys who are, or are not, officers of a corporate employer; rather, the core idea is that an attorney be the one responsible ("resulting" . . . "caused by") for the default or default judgment. Two, it does require that there be a client, i.e., an attorney-client relationship.

■ In this regard, there is one salient, dispositive point of law: *Only* attorneys may represent clients in court. (Bus. & Prof. Code, § 6125 ["No person shall practice law in California unless the person is an active member of the State Bar."].) Thus, if an attorney is responsible for a default, by definition that responsibility implicates the attorney's services *as an attorney*, and not as a corporate officer. There is thus nothing in the substance of section 473 that suggests that courts should treat in-house counsel who are not officers any differently from in-house attorneys who are corporate officers. To do so, a court would have to *read into* section 473 an exception not present in the language. (Code Civ. Proc., § 1858 ["In the construction of a statute . . . the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . . ."].) This we decline to do.

In this regard, we find *Trope* instructive. *Trope*, like this case, was a statutory interpretation case. And it certainly did not conflate attorneys with their "clients." The case is a sustained meditation on the language of section 1717, California's reciprocal attorney fee statute. Hence, the high court began its analysis, after quoting the pertinent language of section 1717, by declaring: "Our resolution of this issue *turns on how we construe section 1717, and particularly on how we define the words 'reasonable attorney's fees'* in subdivision (a) of that statute." (*Trope, supra*, 11 Cal.4th at pp. 279–280, italics added.)

The *Trope* court went on to emphasize the importance of the word "*incurred*" in the statute (*Trope, supra*, 11 Cal.4th at p. 280, original italics), quote from a legal dictionary on the meaning of the word "fee" (*ibid.*), augment that definition with case law on the meaning of " 'reasonable attorney's fees' " (*id.* at pp. 280–282), address seemingly contrary case law by noting that the "Legislature has now spoken on the subject" (*id.* at p. 283), return to the theme of legislative intent by noting that nonattorney professionals were never intended to recover for their time under section 1717 (see 11 Cal.4th at p. 285 ["it is clear that when it enacted section 1717 the Legislature did not intend to allow doctors, architects, painters, or any other nonattorneys to receive compensation for the valuable time *they* spend litigating a contract matter . . ."]), and finish up by making the point that treating self-representing attorneys differently than such nonattorney professionals would "conflict with the legislative purpose" of section 1717 (11 Cal.4th at p. 285).

And, in fact, the *Trope* court was quite unmoved by the policy arguments presented by the self-representing attorneys there: The court stuck to the plain meaning of the statutory language: "In light of the foregoing, we do not find Trope & Trope's public policy arguments sufficiently compelling to support a conclusion that the Legislature must have intended the words 'reasonable attorney's fees' in section 1717 to carry *some special significance other than their usual and ordinary meaning* or their established legal definition because it wished to facilitate or encourage self-representation by attorney litigants." (*Trope, supra*, 11 Cal.4th at p. 292, italics added.)[8]

---

[8] *Trope*, interestingly enough, touched on the issue of whether a litigant represented by in-house counsel should recover fees, but said resolution of the question "must await another day." (*Trope, supra*, 11 Cal.4th at p. 291.) As we have seen above, when the question was addressed in *PLCM*, the answer was yes.

■ What we have noted about *Trope* applies just as much to this case: There is no differentiation in the statutory text between attorneys and in-house attorneys, or between in-house attorneys who are corporate officers and those who are not, and there is nothing in the language or structure of section 473 to require an implied differentiation. As we have seen from *General Dynamics* and *PLCM*, in-house counsel *do* have an attorney-client relationship with their corporations, and as we have seen from *PLCM*, in-house attorneys do represent their employers. It therefore follows that the legislative intent in enacting the mandatory provision of section 473 was to protect corporations represented by in-house counsel as much as any other class of litigants represented by counsel.

Two more points, however, must be noted. First, unlike an attorney who represents himself (as in *Trope* or as in *Esther B. v. City of Los Angeles* (2008) 158 Cal.App.4th 1093 [70 Cal.Rptr.3d 596] [attorney who was her own client, representing herself, her daughter and, ostensibly, the taxpayers, bungled her own fee request and could not receive relief under § 473]), a corporation *must* be represented in court by an attorney. (*Paradise v. Nowlin* (1948) 86 Cal.App.2d 897, 898 [195 P.2d 867] ["A corporation cannot appear in court by an officer who is not an attorney and it cannot appear in propria persona."].) The very corporate form then, in the context of *litigation*, treats in-house attorneys, whether they be officers or not, as agents separate from the corporation itself.

Second, the case law distinguishes between corporate counsel who perform "*strictly legal services*" for a corporation (so that, for example, in performing those services there is an attorney-client privilege) and services of a "nonlegal *business* nature." (Friedman, Cal. Practice Guide: Corporations, *supra*, ¶ 6.1.1, p. 6-1, original italics.) Acting as a *contract negotiator* with a third party outside of court—say a labor union—is an example of such "nonlegal" business. (See *Montebello Rose Co. v. Agricultural Relations Bd.* (1981) 119 Cal.App.3d 1, 32 [173 Cal.Rptr. 856].)

As we have noted, representing clients *in court* is the quintessential *legal* service performed by an attorney, in-house or outside. Obviously some defalcation on an attorney's part leading to a default judgment issued by a court falls on the legal services side of the legal services/business services dichotomy.

Finally, even if, for sake of argument, a court should consider creating an implied exception to the statutory language of section 473 as regards mandatory relief from default or default judgment when caused by a corporate officer-attorney's "mistake, inadvertence, surprise, or neglect," the instant case is the last case appropriate for such an exception. Gray's declaration is clear that he was not acting as a corporate officer in neglecting to file a response to the Gutierrez action; he concealed the matter from his fellow corporate officers, and was able to do so only because of his role as sole in-house attorney. This is not a case where an in-house attorney *conspired* with management to "take the fall" to further some silly scheme to use section 473 to buy time in litigation.[9] In this case, the in-house attorney never had any management responsibilities and only did law.[10]

## C. *Is the Mandatory Relief Provision of Section 473 Constitutional? Yes*

Gutierrez also presents an argument based on the miscarriage of justice provision of the California Constitution (Cal. Const., art. VI, § 13), which provides that no judgment may be set aside unless "after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."[11]

---

[9] At oral argument, Gutierrez's counsel evoked the image of a corporation that would throw its corporate officer-in-house counsel "under the bus" to further a scheme of, essentially, buying time by having the corporate officer-in-house attorney (pick your metaphor) fall on his or her sword, or take a bullet for the team, simply in order to delay the litigation. There are two answers to the point:

First, such a conspiracy cannot work under section 473 as written, because if a management-attorney conspiracy is involved, then, by definition, any resulting default or default judgment would not be "in fact caused by the attorney's mistake, inadvertence, surprise, or neglect"—it would be the product of a conspiracy to buy time. (See *SJP Limited Partnership, supra*, 136 Cal.App.4th 511, 519–520 [intentional misconduct on client's part would negate mandatory relief under § 473].)

Second, the scenario is ludicrously farfetched. It not only presumes that the attorney is willing to sacrifice his or her reputation for the most marginal of reasons—remember, the lawsuit would still have to be defended anyway—but what corporate management in its right mind wants to allow any sort of default judgment to be taken against it at all? Indeed, even if a default or default judgment were eventually expunged, the potential liability would still have to be disclosed on the corporate books. No sane corporate management wants either to happen.

[10] Gray clearly fell sufficiently on his sword in his declaration to qualify for mandatory section 473 relief, but the declaration does not say whether his "neglect alone" was a sheepishness borne of being embarrassed that some previous advice of his had gotten the company sued, combined with click-your-heels-and-close-your-eyes wishful thinking that the case would miraculously go away by itself without Pearson ever finding out about it, or, alternatively, a simple deer-in-the-headlights inability to cope with the requirements of real litigation. Either way, it makes no difference given that Gray was successful in his concealment from corporate management until a large judgment was entered.

[11] Article VI, section 13 of the California Constitution reads, in its entirety, as follows: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of

The argument borders on the frivolous in light of the well-established judicial preference that causes be decided on the merits. (E.g., *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1364 [63 Cal.Rptr.3d 483, 163 P.3d 160] [observing that preference for decisions on the merits "prevails" over the "demanding efficiency" of fast-track statutes].)

The argument is also highly ironic given that, on appeal, it is *Gutierrez*, as appellant, not G & M, as respondent, who has the burden of demonstrating that the trial court made an "error" which resulted in a miscarriage of justice. (See *Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82 [265 P.2d 513] ["The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice."]; *In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 205 [90 Cal.Rptr.3d 802] [" 'the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice' "].) And in that regard Gutierrez does nada in this appeal to show that allowing the case to be decided *on the merits* rather than by default judgment in any way results in a miscarriage of justice.

The argument also relies on inapposite authority. This court's decision in *In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519 [11 Cal.Rptr.3d 671] is readily distinguishable: There, a family law case was tried, but no one complained about the absence of a final declaration of disclosure until the point was raised in a new trial motion. The wife, attacking the judgment on appeal, then touted the absence of a final declaration of disclosure as a kind of " 'get-a-new-trial-free card.' " (*Id.* at p. 522.) But she could not articulate *any prejudice* as a result of the nondisclosure, so we held that the judgment could not constitutionally be set aside. Moreover, our decision by no means said that the Family Code nondisclosure set aside statute was ipso facto unconstitutional. When an appellant *can* show prejudice from the nondisclosure, the statute is not trumped by the constitutional miscarriage of justice provision. (*Id.* at p. 528 [if litigant not complying with disclosure statute identified "some portion of the judgment materially affected by the nondisclosure," statute could still be basis of reversal].) In the case before us, of course, G & M readily shows prejudice in the set aside judgment—about $4 million worth of prejudice.

the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

## IV.  DISPOSITION

The order setting aside the default judgment is affirmed. Because the case involves an issue of first impression, each side will bear its costs on appeal.

Moore, J., and Aronson, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 14, 2010, S183385.