Filed 9/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CRAIG MISSAKIAN, | B296749 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC616089) |
| v. | |
| AMUSEMENT INDUSTRY, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rafael A. Ongkeko, Judge. Reversed and remanded with directions.

Salisian Lee and Richard H. Lee; Law Offices of Craig Missakian and Craig H. Missakian; Greines, Martin, Stein & Richland and Timothy T. Coates for Plaintiff and Appellant.

Bashir E. Eustache for Defendant and Appellant Amusement Industry, Inc.

Tucker Ellis, Marc R. Greenberg for Defendant and Appellant Allen Alevy.

Professor Laurie Levenson as Amicus Curiae on behalf of Defendant and Appellant Amusement Industry, Inc.

———————————————————

Former in-house counsel Craig Missakian (Missakian) filed suit against his former employer Amusement Industry, Inc. (Amusement) and its founder Allen Alevy (Alevy),[1] based on an oral promise to pay a bonus and share of recovery from litigation. The jury issued a special verdict in favor of Missakian on the claims brought against Amusement for breach of oral contract and promissory fraud, but the jury also made special verdict findings in favor of Alevy on the sole claim of promissory fraud brought against him, finding that Alevy did not make a false promise. The trial court granted judgment notwithstanding the verdict (JNOV) on Missakian's promissory fraud claim against Amusement. Each party filed an appeal.

Amusement appeals from the portion of the judgment awarding damages for breach of oral contract. Amusement contends the contract in question is void under Business and Professions Code section 6147,[2] which requires contingency fee agreements to be in writing. We hold that, regardless of his status as in-house counsel, Missakian's oral agreement with

---

[1] Amusement and Alevy were represented by separate counsel at trial, as they are here on appeal.

[2] All statutory references are to the Business & Professions Code, unless specified otherwise.

2

Amusement is a contingency fee agreement subject to section 6147 and is therefore unenforceable as a matter of law.

Missakian appeals from the order granting JNOV on the promissory fraud claim. We find the jury's special verdict to be inconsistent because it found Alevy did not make a false promise, but that Amusement (acting only through Alevy) did. Because the court cannot choose between the jury's inconsistent responses, the court should have ordered a new trial as to all parties rather than JNOV.

Alevy appeals from a postjudgment order denying his motion for attorney fees. In light of our reversal of the judgment and remand for a new trial, Alevy's contentions are moot.

The judgment is reversed, and the case is remanded for a new trial as to all parties.

## FACTUAL BACKGROUND

During the time frame relevant to this case, Alevy was an owner, officer, and board member of Amusement, with authority to enter into contracts on behalf of Amusement. Amusement was a real estate company, and the company was engaged in ongoing litigation (the Stern Litigation) in New York, stemming from a real estate deal in which Amusement lost $13 million to an alleged fraudster. Sometime in the summer of 2010, Alevy contacted Missakian to discuss the prospect of Missakian working as an in-house attorney at Amusement, where Missakian's duties would include working on the Stern Litigation.

Alevy offered and Missakian accepted the terms of his employment at Amusement (the Oral Contract). As general

3

counsel,[3] Missakian would receive a salary of $325,000. Once the Stern Litigation resolved, Missakian would receive a bonus of $6,250 for each month he had worked on that litigation (Monthly Bonus), and an additional bonus of ten percent of the recovery in the Stern Litigation, excluding ordinary litigation costs (Stern Litigation Bonus). The parties exchanged multiple written drafts negotiating various details of the Oral Contract, but they never signed a written contract. Missakian started working as an employee at Amusement on December 10, 2010, spending most of his time on the Stern Litigation, but doing some other work as well.

In March 2011, Missakian learned of the existence of a draft agreement that significantly altered the terms of the Oral Contract, specifying that the Stern Litigation Bonus would be based not on all amounts recovered, but on the balance after Amusement's initial $13 million loss and other litigation expenses (such as in-house and outside attorney fees) had been deducted. Missakian "blew up" upon discovering this new draft, but Alevy reassured him that the language was a mistake. Missakian continued working, periodically inquiring about a revised agreement. Alevy usually deflected his inquiries.

As the Stern Litigation moved closer to settlement, Missakian renewed his efforts to reduce the Oral Contract to writing. He sent a new draft agreement to Alevy on April 7, 2014. Alevy told Missakian he already had a signed agreement in his personnel file. Upon obtaining the copy (which was dated December 10, 2010 and was signed by Alevy) from his personnel

---

[3] While there was some dispute over Missakian's job title, there is no dispute that Missakian's job duties involved the practice of law.

4

file, Missakian believed Alevy and Amusement were trying to change the Oral Contract, because the version from the file again contained language that Missakian had disputed in March 2011.  Later the same day, Missakian sent an e-mail to Alevy and Yanki Greenspan, president of Amusement, that included the following:  "When I first saw this agreement I was furious and almost quit on the spot.  I was told that it was a mistake.  Now I see that I was lied to and that it was not a mistake but an attempt to paper the file without my knowledge.  I simply cannot believe that this was done or that anyone could believe it would hold up in court.  Please understand that if we cannot resolve the matter this week, I will be submitting my resignation based on the company's tortious denial of and anticipatory breach of our oral agreement that was memorialized in the writing and upon which I relied in leaving my previous job."  Missakian and Amusement were unable to resolve their differences.  After he was offered a position in federal government, Missakian left Amusement, effective August 1, 2014.

The Stern Litigation settled in February 2015, with Amusement receiving a settlement of $26 million.  Missakian never received the Monthly Bonus or the Stern Litigation Bonus.

## PROCEDURAL HISTORY

### A.  Complaint, demurrer, and writ

In April 2016, Missakian filed suit against Alevy and Amusement, alleging five causes of action: breach of contract,

fraudulent inducement, failure to pay wages (Labor Code, § 203), declaratory relief, and accounting. The complaint named Amusement as a defendant for all causes of action. The only claim naming Alevy as a defendant was the fraudulent inducement claim.[4]

Alevy and Amusement filed a demurrer to the complaint and moved to strike from the complaint all references to the Stern Litigation Bonus. Both defendants argued that Missakian was barred from enforcing the Oral Contract, because a contingency fee agreement is voidable unless in writing, signed by both parties. The trial court overruled the demurrer, but granted the motion to strike, reasoning that section 6147 barred enforcement of an oral contingency fee agreement.

Missakian filed a petition for writ of mandate, seeking relief from this court. Missakian argued the trial court made two errors when it granted the motion to strike. First, the court erroneously construed section 6147 to apply to employee-attorneys, a question of first impression in California. Second, contrary to the standard applicable at the demurrer stage, the court decided a contested factual issue, concluding that Missakian was an independent contractor earning a fee, rather than an employee earning wages.

_____

[4] The complaint alleges fraudulent inducement, but by trial, the parties and the court referred to this cause of action as promissory fraud. We understand the claim of fraudulent inducement and promissory fraud to be the same. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 ["An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract"].)

6

Ruling on Missakian's petition, this court offered the following tentative conclusion: "In reviewing an order sustaining a demurrer, we take the allegations of the complaint as true. (*Dale v. City of Mountain View* (1976) 55 Cal.App.3d 101, 105.) Plaintiff's complaint alleges that the parties agreed he would receive 'a bonus equal to 10% of any and all sums recovered in the [Stern litigation] or related matters.' Whether the bonus constitutes wages or attorney's fees is a factual question that cannot be determined on the pleadings. (See, e.g., *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425,431 ['Whether a person is an employee or an independent contractor is ordinarily a question of fact'].)" (*Missakian v. Superior Court*, B278773, Nov. 15, 2016.) We issued an alternative writ directing the trial court to either (a) vacate its order granting the motion to strike and enter a new order denying the motion to strike, or (b) show cause why a peremptory writ should not issue. (*Ibid.*) The trial court subsequently entered a new order, denying the motion to strike.

**B. Pretrial motions**

Before trial, the parties filed several motions in limine raising the issue of the Oral Contract's enforceability under section 6147 or rule 3-300 of the California Rules of Professional Conduct (rule 3-300). All parties agreed that Missakian was an employee, and that any contract was oral, not written. Referencing this court's alternative writ, the trial court found that the questions of contract terms and breach were factual questions for the jury. It granted Missakian's motions in limine

7

on the oral contract question, and denied Amusement and Alevy's motions on the same issue.

## C. Special verdicts after trial

The parties went to jury trial on two causes of action: breach of oral contract and promissory fraud. The jury found that Amusement had breached the Oral Contract. For Amusement's failure to pay the Stern Litigation Bonus, the jury awarded Missakian $2.25 million, and for the failure to pay the Monthly Bonus, the jury awarded $275,000.

On the promissory fraud claim, the jury ultimately entered a special verdict in favor of Alevy, but against Amusement.[5] It made special verdict findings that while Alevy made a promise to Missakian, he intended to keep the promise when made. However, the jury found against Amusement on the promissory fraud claim, finding it made a false promise, and awarded Missakian $750,000 in compensatory damages. The jury further found that Amusement acted with malice, oppression, and/or fraud, and awarded $1,750,000 in punitive damages against Amusement.

## D. Amusement's posttrial motions

After the jury returned its verdict, Amusement filed motions for new trial and JNOV. The trial court denied Amusment's new trial motion, as well as the portion of the

---

[5] In our discussion of Missakian's promissory fraud claim, *infra*, we include additional detail about the special verdict forms and the jury's responses.

8

JNOV motion relating to Missakian's breach of contract claim. The court granted Amusement's JNOV motion as to the promissory fraud claim, explaining "that because Defendant Alevy was found not liable for fraud, neither should defendant Amusement have been found liable for fraud. The court agrees with Amusement that Plaintiff's sole theory of promissory fraud began and ended with his dealings with Defendant Alevy. . . . If Alevy did not make a false promise, as the jury found, whatever reliance Plaintiff had was not based on anything false." Rejecting Missakian's argument that there was evidence of arguably fraudulent acts or statements by other individuals acting on behalf of Amusement, the court explained that the jury was not instructed on that "different (and unpled) fraud theory." Finding that there was no substantial evidence to support Amusement's liability for promissory fraud, the court granted JNOV in part, as to the promissory fraud and punitive damage judgment against Amusement.

**E. Alevy's motion for attorney fees**

Alevy filed a motion to recover his attorney fees based on the Oral Contract's fee provision. The trial court denied Alevy's motion, explaining that because Missakian's sole claim against Alevy—fraudulent inducement—is a tort claim, not a contract claim, attorney fees were not available under Civil Code section 1717. Alternatively, even if Civil Code section 1717 applied to Missakian's fraudulent inducement claim, it would be incongruous and inequitable to hold Missakian liable for

9

attorney fees when he had prevailed on his breach of contract claim, brought against Amusement only.[6]

## DISCUSSION

### A. Breach of oral contract

Amusement appeals from the judgment, arguing that Missakian cannot prevail on his breach of contract claim because the Oral Contract between Missakian and Amusement is voidable under section 6147.[7] Missakian counters that section 6147 does not apply to in-house attorneys who represent their employers in litigation, because in-house attorneys are paid wages, not fees. We conclude that the Oral Contract was a contingency fee agreement subject to the requirements of section 6147. Under the circumstances of this case, the fact that Missakian was an in-house attorney working for Amusement did not relieve him of the obligation to comply with section 6147, including the requirement to put the specifics of this contingency fee agreement into a writing signed by both parties. Accordingly, the Oral Contract is voidable, and judgment should

---

[6] While not at issue on this appeal, Missakian sought and obtained an attorney fee award after prevailing on his breach of oral contract claim against Amusement.

[7] As Amusement correctly points out, this court's 2016 alternative writ order never directly addressed the question of whether an attorney employed as in-house counsel must comply with section 6147 to enforce an employment agreement's bonus provision, when the bonus is contingent on the outcome of litigation.

10

have been entered against Missakian on the breach of oral contract cause of action.

### 1. *Standard of review*

The interpretation of a statute is a question of law that we review de novo.  (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)  "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

### 2. The statutory scheme

Section 6147[8] "belongs to a trio of related statutes governing fee contracts between lawyers and their clients.

---

[8] The full text of section 6147 reads: "(a) An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, or the client's guardian or representative, to the plaintiff, or to the client's guardian or representative. The contract shall be in writing and shall include, but is not limited to, all of the following: [¶] (1) A statement of the contingency fee rate that the client and attorney have agreed upon. [¶] (2) A statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery. [¶] (3) A statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the plaintiff by the attorney. [¶] (4) Unless the claim is subject to the provisions of Section 6146, a statement that the fee is not set by law but is negotiable between attorney and client. [¶] (5) If the claim is subject to the provisions of Section 6146, a statement that the rates set forth in that section are the maximum limits for the contingency fee agreement, and that the attorney and client may negotiate a lower rate. [¶] (b) Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee. [¶] (c) This section shall not apply to contingency fee contracts for the recovery of workers' compensation benefits. [¶] (d) This section shall become operative on January 1, 2000."

[Citations.] Section 6146 restricts the use of contingency fee agreements in medical malpractice actions; section 6147 regulates the form and content of contingency fee agreements outside the medical malpractice context; and section 6148 applies to fee agreements that do not involve a contingency fee. [Citation.] These statutes 'operate to ensure that clients are informed of and agree to the terms by which the attorneys who represent them will be compensated.' [Citations.]" (*Pech v. Morgan* (2021) 61 Cal.App.5th 841, 850.) Sections 6147 and 6148 "were enacted to benefit and protect clients . . . by informing them at the outset of the representation in a signed writing, inter alia, of the amount of attorney fees they will incur under fee for service and contingency fee agreements." (*Chodos v. Borman* (2014) 227 Cal.App.4th 76, 101–102 (*Chodos*); see also *Leighton v. Forster* (2017) 8 Cal.App.5th 467, 483.)

An oral contingency fee agreement cannot be enforced by an attorney. Under section 6147, a contingency fee agreement must be in writing, signed by both parties, and include, among other statutory disclosures, "[a] statement of the contingency fee rate that the client and attorney have agreed upon," and "[a] statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery." (§ 6147, subd. (a)(1) and (a)(2).) Section 6147, subdivision (b), provides: "Failure to comply with any provision of this section renders the [contingency fee] agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." "If the contingency fee agreement is void, there is no contingency fee arrangement. 'A void contract is no contract at all; it binds no one and is a mere nullity. [Citation.]

13

Consequently, such a contract cannot be enforced. [Citation.]'
[Citation.]" (*Fergus v. Songer* (2007) 150 Cal.App.4th 552, 573
(*Fergus*).) "[W]hile both [section 6147 and section 6148] provide
that a failure to comply with their requirements renders an
agreement voidable at the client's option, both also specify that,
where an agreement is voided, the attorney remains 'entitled to
collect a reasonable fee.' [Citations.]" (*Huskinson & Brown v.
Wolf* (2004) 32 Cal.4th 453, 460.) While seeking payment on a
quantum meruit theory, the terms of the invalid agreement will
very rarely provide the basis for calculating the quantum meruit
award. (*Chodos, supra,* 227 Cal.App.4th 76 [reversing use of
lodestar multiplier based on invalid oral agreement]; *Fergus,
supra,* 150 Cal.App.4th at p. 558, fn. 1.)

### 3. *Contingency fees*

The plain language of section 6147 imposes requirements
on "an attorney who contracts to represent a client on a
contingency fee basis." (§ 6147, subd. (a).) The California
Supreme Court has described attorney fees as "the consideration
that a litigant pays or becomes liable to pay in exchange for legal
representation." (*Trope v. Katz* (1995) 11 Cal.4th 274, 282
(*Trope*).) The court in *Arnall v. Superior Court* (2010) 190
Cal.App.4th 360 (*Arnall*), considered the definition of "contingent
fee" as a matter of first impression, explaining that since section
6147 itself does not define the term, the court would "look first to
the term's 'plain meaning' for guidance on these questions.
[Citation.]" (*Id*. at pp. 369–370.) The *Arnall* court focused on the
elements of risk and success as the hallmarks of a contingency
fee, explaining: "[t]he term 'contingency fee contract' is ordinarily

14

understood to encompass any arrangement that ties the attorney's fee to successful performance[.]" (*Id*. at p. 370) Similarly, discussing contingency fees generally, the court in *Chodos, supra,* 227 Cal.App.4th at page 95, footnote 9, explained that both contingency fee arrangements and cases pursued under fee-shifting statutes pose some level of "contingent risk," referring to "the risk an attorney voluntarily assumes by agreeing to base the payment of fees on the successful outcome of the case, and not simply the risk of nonpayment, which exists in every representation of a client by an attorney." In *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132–1133, the California Supreme Court discussed the role of contingency fees and contingent risk in the context of calculating the lodestar on a fee award: ""'[a] contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would otherwise be reasonable.'"'"

Dictionaries and treatises further support our understanding that the term "contingency fee" generally refers to compensation tied to the client's success. Black's Law Dictionary defines "contingent fee" or "contingency fee" as "[a] fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court. Contingent fees are us[ually] calculated as a percentage of the client's net recovery (such as 25% of the recovery if the case is settled, and 33% if the case is won at trial)." (Black's Law Dict. (11th ed. 2019).) According to the Restatement Third of the Law Governing Lawyers, a contingency fee contract "is one providing for a fee the size or payment of which is conditioned on some measure of the client's success. Examples include a contract that a lawyer will receive one-third of a client's recovery and a contract that the lawyer will

15

be paid by the hour but receive a bonus should a stated favorable result occur."  (Rest.3d Law Governing Lawyers, § 35, com. a, p. 257; see also 1 Witkin, Cal. Proc. (5th ed. 2008, Attorneys, § 176, p. 245.)  The Merriam-Webster Unabridged Dictionary defines "contingency fee" as "a fee for services (as of a lawyer or agent) to be paid in the event of success in a particular transaction usually as a specified percentage of the sum realized for the client or principal."  (Merriam-Webster's Unabridged Dict. (2021) <https://unabridged.merriam-webster.com/unabridged/contingency%20fee> [as of Sept. 28, 2021], archived at <https://perma.cc/P2MC-99P2>.)

### 4.  The role of in-house counsel

Next, we turn to the initial portion of section 6147, stating it covers "[a]*n attorney who contracts to represent a client* on a contingency fee basis," (§ 6147, subd. (a), italics added.)  As the California Supreme Court has already recognized, an in-house attorney representing a company in court occupies a role equivalent to the role of private counsel engaged to represent the client.  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1093 (*PLCM*).)

In *PLCM*, a legal malpractice insurance company prevailed in a lawsuit brought by the insurance company against its insured (an attorney) for a deductible payment.  The insured cross-complained, asserting bad faith and related claims.  The insurance company was represented in the litigation by its parent company's in-house attorneys.  After the insurance company prevailed, it sought an award of attorney fees under Civil Code section 1717, which makes contractual attorney fee

provisions reciprocal for all contracting parties and treats awards of such fees similarly to the award of statutory attorney fees. The insured argued that attorney fees for in-house counsel were not available under Civil Code section 1717, relying on *Trope, supra,* 11 Cal.4th at page 282, which held that self-represented litigants were not entitled to attorney fees. (*PLCM, supra*, 22 Cal.4th at pp. 1089–1090; *Trope, supra*, 11 Cal.4th at pp. 280–285.) The *PLCM* court disagreed, pointing out that *Trope* expressly declined to answer the question of whether in-house counsel fees could be recovered. (*PLCM, supra*, 22 Cal.4th at p. 1093; *Trope, supra*, 11 Cal.4th at p. 291.)

The *PLCM* court concluded that the cost of representation by in-house attorneys fell within the scope of attorney fees available under Civil Code section 1717, basing its reasoning on the nature of the work involved and the function of in-house attorneys in the litigation. In-house attorneys providing legal representation to the company "do not represent their own personal interests and are not seeking remuneration simply for lost opportunity costs that could not be recouped by a nonlawyer. A corporation represented by in-house counsel is in an agency relationship, i.e., it has hired an attorney to provide professional legal services on its behalf." (*PLCM, supra*, 22 Cal.4th at p. 1093.) The similarities between in-house attorneys and privately retained attorneys favored construing Civil Code section 1717 to include costs associated with in-house attorneys: "The fact that in-house counsel is employed by the corporation does not alter the fact of representation by an independent third party. Instead, the payment of a salary to in-house attorneys is analogous to hiring a private firm on a retainer." (*PLCM, supra,* 22 Cal.4th at p. 1093.) An organization cannot represent itself, and so must

17

rely either on in-house or privately retained attorneys. "We discern no basis for discriminating between counsel working for a corporation in-house and private counsel engaged with respect to a specific matter or on retainer. Both are bound by the same fiduciary and ethical duties to their clients. (See *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1190 [(*General Dynamics*)].) Both are qualified to provide, and do provide, equivalent legal services. And both incur attorney fees and costs within the meaning of Civil Code section 1717 in enforcing the contract on behalf of their client." (*PLCM, supra,* 22 Cal.4th at p. 1094.)[9]

In *Gutierrez v. G & M Oil Co., Inc.* (2010) 184 Cal.App.4th 551 (*Gutierrez*), the defendant company sought mandatory relief from a default judgment entered against it, citing the attorney fault provision in Code of Civil Procedure section 473. In the litigation, the company's in-house attorney (who held dual titles, as vice-president and general counsel) elected not to hire outside counsel, instead opting to personally represent the company in a class action lawsuit. The in-house attorney did not inform anyone else in the company about the lawsuit, and then failed to take any action to defend the case, respond to multiple notices of default, produce ordered discovery, or contest entry of a four-million-dollar judgment. The class plaintiffs opposed relief from default, arguing that the in-house attorney's misconduct must be imputed to the company, thereby making mandatory relief under Code of Civil Procedure section 473 unavailable. (*Gutierrez, supra,* 184 Cal.App.4th at pp. 554–557.)

---

[9] We discuss *General Dynamics* in more detail in connection with Missakian's arguments, *infra.*

The appellate court declined to read into Code of Civil Procedure section 473 an implied exemption for in-house attorneys based solely on the fact that the in-house attorney also held the title of a corporate officer. The court explained: "There is a distinction between corporate counsel who provide 'strictly legal services' to a corporation, and corporate counsel who 'step out' of their role as 'legal advisor' and provide services of a 'nonlegal business nature.' (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2009) ¶ 6.1.1, p. 6–1 [], italics omitted.) In this case, the in-house 'general counsel' was *only* acting in his capacity as a lawyer, and providing *only* services of a legal nature, and was most certainly not acting in any role as a corporate officer. . . . Because he was a lawyer, acting as a lawyer, there is no need for us to carve out, in this case, any implied exception . . . ." (*Gutierrez, supra,* 184 Cal.App.4th at p. 555.) The *Gutierrez* court emphasized that "representing clients *in court* is the quintessential *legal* service performed by an attorney, in-house or outside." (*Gutierrez, supra*, 184 Cal.App.4th at p. 564.) The *Gutierrez* court then turned to the meaning of the statute at issue: "There is no differentiation in the statutory text between attorneys and in-house attorneys, . . . and there is nothing in the language or structure of section 473 to require an implied differentiation. As we have seen from *General Dynamics* and *PLCM,* in-house counsel *do* have an attorney-client relationship with their corporations, and as we have seen from *PLCM,* in-house attorneys do represent their employers. It therefore follows that the legislative intent in enacting the mandatory provision of [CCP] section 473 was to protect corporations represented by in-house counsel as much as

19

any other class of litigants represented by counsel." (*Gutierrez, supra*, 184 Cal.App.4th at p. 564.)

### 5. *Analysis*

Given the terms of the Oral Contract at issue in this case, most significantly the Stern Litigation Bonus, and cognizant of Missakian's principal role as an attorney representing Amusement in the Stern Litigation, we readily conclude that he acted as "[a]n attorney who contract[ed] to represent a client on a contingency fee basis." (§ 6147, subd. (a).) Similar to Code of Civil Procedure section 473 discussed in *Gutierrez*, section 6147 has no express language exempting in-house attorneys, nor does the statute's plain language support an implied exemption.[10]

Despite the foregoing, Missakian argues for a wholesale exemption for in-house attorneys from the requirements of section 6147. We disagree. Missakian contends section 6147 does not apply to in-house attorneys' employment agreements,

[10] This lack of any exception stands in contrast to the provision covering non-contingent fees, section 6148. Under section 6148, a signed writing is not required if the client is a corporation, or if the client knowingly states, in writing, that a writing concerning fees is not required. (§ 6148, subd. (d)(3) and (d)(4).) Section 6450, subdivision (b)(8), prohibits paralegals from setting their own fees, but goes on to clarify that "[t]his paragraph does not apply to fees charged by a paralegal in a contract to provide paralegal services to an attorney, law firm, corporation, governmental agency, or other entity . . . ." If the Legislature intended to exempt in-house attorneys from the requirements of section 6147, it could have included similar language.

20

because in-house attorneys are paid "wages," not "fees," and the use of the word "fees" reflects the Legislature's intent to exempt in-house attorneys. In support of this argument, he cites to Labor Code section 200, subdivision (a), and its broad definition of "wages."[11] Reference to this Labor Code definition, however, offers little assistance in interpreting section 6147. Even if a particular form of compensation meets the definition of "wages" under the Labor Code, it may also meet the definition of a "contingency fee" in section 6147. The usual and common-sense meaning of the term fee is broad enough to encompass compensation paid to an in-house attorney, and a review of cases makes that clear. (See, e.g., *PLCM, supra,* 22 Cal.4th at p. 1093 ["payment of a salary to in-house attorneys is analogous to hiring a private firm on a retainer"]; *Lolley v. Campbell* (2002) 28 Cal.4th 367, 373 ["California courts have routinely awarded fees to compensate for legal work performed on behalf of a party pursuant to an attorney-client relationship"]; *Trope, supra,* 11 Cal.4th at p. 282 ["the usual and ordinary meaning of the words 'reasonable attorney's fees' is the consideration that a litigant pays or becomes liable to pay in exchange for legal representation"].)

Missakian attempts to bolster his argument for a narrow reading of the term "fee" by pointing to two cases—*General Dynamics, supra,* 7 Cal.4th 1164, and *Chyten v. Lawrence & Howell Investments* (1993) 23 Cal.App.4th 607 (*Chyten*)—that he

---

[11] Labor Code section 200, subdivision (a), states: "'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

21

claims demonstrate the Legislature's awareness of case law drawing a sharp distinction between the contractual rights of in-house attorneys and privately retained attorneys. While both cases draw a distinction between in-house and privately retained attorneys in situations where the client ends the attorney-client relationship, we find nothing in the reasoning of either case to support reading section 6147 narrowly to exclude in-house attorneys from its requirements. Instead, both cases underscore that in-house attorneys are in an attorney-client relationship with their employers, and redress for any wrong done by an employer to an in-house attorney must preserve and protect, to the extent possible, the attorney-client relationship with all its legal, ethical, and professional obligations.

Both *Chyten* and *General Dynamics* were decided against the backdrop of the holding in *Fracasse v. Brent* (1972) 6 Cal.3d 784 (*Fracasse*), that when a client discharges an attorney, the attorney cannot sue for breach of contract, but rather is limited to a quantum meruit recovery. "In doing so, we preserve the client's right to discharge his attorney without undue restriction, and yet acknowledge the attorney's right to fair compensation for work performed." (*Id*. at p. 791.) *Fracasse* involved a traditional contingency fee agreement between a personal injury attorney and an individual client. (*Id*. at p. 786.)

In *Chyten*, an attorney negotiated a five-year written contract for an in-house counsel position, including a clause that required the employer to pay contractual damages if the attorney was terminated without cause. (*Chyten, supra,* 23 Cal.App.4th at pp. 610–611.) The company fired the attorney, who obtained a jury verdict for breach of the employment contract. On appeal, the company pointed to *Fracasse* to argue that the attorney's

22

damages were limited to quantum meruit, not contract damages. (*Id*. at p. 611–612.)  The appellate court disagreed, noting that the contract "was freely negotiated between parties of relatively similar sophistication and bargaining power," and "involved terms typical of an employer-employee relationship and not typical of attorney-client contingent fee contracts."  (*Id*. at p. 613.)  Although "the parties had a confidential relationship and [the attorney] had professional obligations which an attorney owes to a client, their business relationship was very different from that involved in *Fracasse*."  (*Id*. at p. 612.)  The contract's termination clause did not deprive the company of its right to remove an attorney from representing it in an action or proceeding; instead, the clause provided the measure of compensation applicable after the company's decision to terminate the attorney from his salaried position.  (*Id*. at p. 615 & fn. 3.)  *Fracasse* was distinguishable because it involved a contingent fee for representing a client in a specific proceeding, and the rules limiting a client's exposure to duplicative liability on a contingency fee contract stemmed from a desire to protect the client from the risk of excessive or double payment for a single result.  (*Id*. at pp. 615–616.)  Because the facts of *Chyten* involved a written employment contract, we see nothing in that opinion's reasoning to support Missakian's argument that section 6147 does not apply to in-house attorneys.  In fact, the case underscores the need for a contingency fee agreement to be reduced to writing in compliance with section 6147 to ensure that the terms of the agreement are clear to both parties from the beginning.

In *General Dynamics*, the California Supreme Court upheld an in-house attorney's right to bring tort and contract claims for

wrongful discharge against an employer in certain circumstances. (*General Dynamics, supra,* 7 Cal.4th at p. 1169.)  Like *Chyten*, *General Dynamics* involved an attorney who claimed he had been wrongfully terminated.  (*Id.* at p. 1171.)  The opinion includes "an extended and nuanced disquisition of the role of in-house attorneys." (*Gutierrez, supra,* 184 Cal.App.4th at p. 559*.*)  The *General Dynamics* court discussed the increasing numbers of in-house attorneys and the unique confluence and potential conflicts inherent in that role, particularly with respect to an attorney's professional and ethical duties.  (*General Dynamics*, *supra,* 7 Cal.4th at pp. 1171–1173.)  The court's decision was heavily qualified to emphasize that the holding was based on facts that were unlikely to have an adverse impact on the central values of the attorney-client relationship.  The opinion explains:  "because so-called 'just cause' contractual claims are *unlikely to implicate values central to the attorney-client relationship*, there is no valid reason why an in-house attorney should not be permitted to pursue such a contract claim in the same way as the nonattorney employee.  Our conclusion with respect to the tort cause of action is qualified; our holding seeks to accommodate two conflicting values, both of which arise from the nature of an attorney's professional role—the fiducial nature of the relationship with the client, on the one hand, and the duty to adhere to a handful of defining ethical norms, on the other.  As will appear, we conclude that there is no reason inherent in the nature of an attorney's role as in-house counsel to a corporation that in itself precludes the maintenance of a retaliatory discharge claim, *provided it can be established without breaching the attorney-client privilege or unduly endangering the values lying at the heart of the professional relationship*." (*Id.* at p. 1169, italics added.)  The

24

court distinguished *Fracasse,* but emphasized the importance of the attorney-client relationship. (*Id*. at p. 1178.) As the *Gutierrez* court later noted: "The important thing about *General Dynamics* for our purposes is that there is no way one can read it without coming away with this basic thought: In-house attorneys employed as attorneys for their employer do indeed have an attorney-client relationship with their employers." (*Gutierrez, supra*, 184 Cal.App.4th at p. 559.)

Missakian contends that finding section 6147 applicable to in-house attorneys would lead to an untenable situation, where all in-house attorneys would be stripped of any statutory protections relating to their compensation arrangements, regardless of whether the agreement was in writing or not. According to Missakian, if all in-house counsel employment contracts were considered "fee" agreements, they would be subject to Rule of Professional Conduct 1.5, which prohibits lawyers from charging unconscionable or illegal fees and describes the factors for determining whether a fee is unconscionable. Missakian then paints a worst-case scenario where "every employment contract would have to be evaluated for unconscionability using the cited factors" and an employer would be free to unilaterally reduce an in-house counsel's salary based on the employer's subjective valuation of the attorney's services. We disagree that our plain language reading of the term "contingency fee" in section 6147, and the application of section 6147 to the Oral Contract here, would have such tumultuous results.

The dual status of in-house counsel—acting as both employee and attorney—and the dual status of the company—acting as both employer and client—can pose some challenging

25

questions about when one role takes precedence over another. However, in the context of interpreting and applying section 6147, there is no persuasive reason to separate the two roles. A company can occupy its status as an employer and a client simultaneously, and we see no reason why its status as an employer should result in less protection for it as a client for purposes of section 6147. Similarly, an in-house attorney's status as an employee should not relieve the attorney of his or her statutory obligation to reduce a contingency fee agreement to a writing that meets the requirements of section 6147.[12] Applying section 6147 to prevent all attorneys—including in-house attorneys—from enforcing oral contingency fee agreements serves valid public policy goals and is consistent with the purpose of the statute, which is to ensure that the person or entity agreeing to pay for legal services and the attorney providing those services have a mutual written understanding of the details of the contingent payment. (See *Arnall, supra*, 190 Cal.App.4th at p. 373 ["when a statute protects the public by denying compensation to parties who fail to meet regulatory demands, the statute

_____

[12] We recognize that there may be compensation arrangements between an in-house counsel and counsel's employer that present difficult questions regarding whether a particular arrangement is correctly characterized as "on a contingency fee basis." We do not attempt to address how section 6147 might apply to every circumstance where an in-house attorney's compensation incorporates an incentive payment based on some measure of the employer's success and to every functional role that a particular in-house attorney may occupy while earning such compensation. But, as noted above, we have no difficulty concluding that the Oral Contract, as described by Missakian, falls within section 6147.

26

constitutes a legislative determination that compliance outweighs any resulting harshness"].)

The very existence of section 6147 reflects that contingency fees warrant stricter regulation than more traditional payment arrangements. Under a traditional model of compensation, an attorney would either be billing the client on a regular basis or receiving a regular salary. In contrast, under a contingency fee agreement, there is no regular course of conduct to reflect the parties' mutual understanding of the fee agreement, as the payment obligation does not accrue until the contingency comes to pass, which can be years after the agreement was reached. Further, once the contingency is met, a contingency fee agreement will reduce the client's recovery, often by a substantial amount. Requiring both the attorney and the client to consent in writing to the details of the contingency fee agreement minimizes the potential for later disagreement and litigation over the details of the agreement. (See § 6147, subd. (a)(2) [requiring agreement to include a "statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery"]; *Pech, supra,* 61 Cal.App.5th at p. 850 [attorney fee statutes operate to ensure clients are informed of and agree to how attorneys will be compensated].)[13]

---

[13] We disagree with the concurrence's statement that a significant factor in determining the scope of section 6147 is whether the contingency fee arrangement is made at the "inception of the attorney-client relationship." The concurrence agrees that section 6147 applies to Missakian, an attorney whose compensation included a contingent component from the

27

Because the Oral Contract is voidable under section 6147, the judgment in favor of Missakian on his breach of oral contract claim must be reversed.[14]

---

"outset" of his employment at Amusement. However, where a hypothetical, long-term in-house counsel is promised the same fee for the same role, the concurrence inexplicably suggests section 6147 would be inapplicable. The statutory language obligates an attorney to provide the client with a written contingent fee agreement "at the time the contract is entered into" (§ 6147, subd. (a)), not just at the start of an attorney-client relationship. The proposed temporal factor is also contrary to the very case the concurrence cites in support— *Chodos*, *supra*, 227 Cal.App.4th at pages 101–102. The *Chodos* court concluded section 6147 bars an attorney from enforcing an alleged oral contingency fee agreement negotiated in the midst of the attorney-client relationship (*id.* at pp. 89–90, 98, 101–102); the statute's reach is not limited to contingency agreements made at the "outset" of the relationship, as the concurrence suggests. Finally, to the extent that the concurrence criticizes a broader reading of our opinion as "unrealistic and likely to invite mischief," we emphasize that the purpose of the statute is to benefit and protect clients, not to protect attorneys. (*Id.* at p. 101.)

[14] Having concluded that Missakian cannot enforce the Oral Contract containing the contingency fee, it is not necessary to address Amusement's alternative contentions that the Oral Contract violated State Bar Rule 3-300, or that Missakian's voluntary departure precludes him from seeking payment of the contingency fee. We also do not express any opinion on Missakian's ability to seek quantum meruit.

28

## B. Promissory fraud

Missakian's appeal seeks to reverse the court's JNOV order and reinstate judgment in his favor on his promissory fraud claim against Amusement. Alternatively, he contends the verdict is inconsistent and a new trial is necessary against both Amusement and Alevy. Amusement contends that JNOV was correctly granted, and that there is no inconsistency in the jury's special verdict because there was no substantial evidence to support a finding of promissory fraud. Alevy contends that no new trial is warranted based on inconsistent verdicts, but in any event, Missakian's request for a new trial is untimely and waived as to Alevy based on Missakian's failure to move for a new trial against Alevy in the trial court.

We conclude the trial court erred by crediting one of two inconsistent special verdict responses, and a new trial on Missakian's promissory fraud claim is necessary.

### 1. *Legal framework and standard of review*

The elements of fraud are misrepresentation, knowledge of falsity, intent to induce reliance on the misrepresentation, justifiable reliance on the misrepresentation, and resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).) Promissory fraud is a subspecies of fraud, and an action may lie where a defendant fraudulently induces the plaintiff to enter into a contract, by making promises he does not intend to keep. (*Ibid.*) "[T]he intent element of promissory fraud entails more than proof of an unkept promise or mere failure of performance." (*Riverisland Cold Storage, Inc. v.*

29

*Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183 (*Riverisland*); *Lazar, supra,* 12 Cal.4th at p. 638 [a promissory fraud claim "does not depend upon whether the defendant's promise is ultimately enforceable as a contract"].) "[P]romissory fraud requires proof of '(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e].' [Citation.]" (*Gruber v. Gruber* (2020) 48 Cal.App.5th 529, 540.)

A trial court may grant the defendant a JNOV only if no substantial evidence supports a verdict in the plaintiff's favor. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.) In passing upon the propriety of a JNOV order, appellate courts view the evidence in the light most favorable to the party who obtained the verdict and against the party to whom JNOV was awarded. (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 546 (*Hasson*), overruled on other grounds by *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548.)

An order granting JNOV "cannot be dependent on another of the jury's verdicts in the case." (*Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 375 (*Stillwell*); see also *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344 (*Shaw*). The law contemplates the entry of a judgment that is in accord with the special verdict. (Code Civ. Proc., § 625.) "If the special verdict is not 'hopelessly ambiguous,' the court may interpret the verdict "'from its language considered in connection with the pleadings, evidence and instructions,'" and counsel's argument

to the jury.  [Citations.]"  (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038 (*Fuller*); *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh)* [trial court must try to resolve any inconsistency "in light of the jury instructions and the evidence"].)  Before a judgment on a special verdict may be entered, the "jury's special verdict findings must be internally consistent and logical."  (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 681 (*D.R. Horton*).)  A special verdict's findings are inconsistent when they are contradictory on a material issue necessary to sustain the judgment.  (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*); *D.R. Horton, supra,* 126 Cal.App.4th at p. 682.)

"On appeal, we review a special verdict de novo to determine whether its findings are inconsistent."  (*Singh, supra,* 186 Cal.App.4th at p. 358.)  "Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law.  [Citation.]  The appellate court is not permitted to choose between inconsistent answers.  [Citations.]"  (*D.R. Horton, supra,* 126 Cal.App.4th at p. 682; *Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 124 (*Trejo*).)  If the special verdict is inconsistent, the proper remedy is to order a new trial.  (*Trejo*, *supra,* 13 Cal.App.5th at p. 124; *Stillwell, supra,* 167 Cal.App.4th at pp. 375–376; *Shaw, supra*, 83 Cal.App.4th at p. 1344.)

31

## 2. *Summary of trial, jury instructions, and jury deliberations*

### a. Trial

In Missakian's opening statement, his attorney told the jury that Missakian would testify he would not have started at Amusement unless he had a concrete deal on the terms of his employment, including the Stern Litigation Bonus and the Monthly Bonus. Explaining Missakian's theory of promissory fraud, Missakian's counsel stated "the idea is that the defendant, or defendants here, would be Mr. Alevy would have made a promise or representation that not only did he not keep, but that there was an immediate repudiation of that promise. [¶] In other words, he did something behind plaintiff's back, or that would be our contention, that was completely contrary to the promise that was just made." Missakian's counsel further explained that Missakian would testify that he met with Alevy, Alevy made him the offer, including the terms of the salary and the bonuses, and that Missakian and Alevy shook hands on the deal. Thereafter, the evidence would show an exchange of e-mails with different versions of a written agreement, fine-tuning certain terms. Counsel outlined that the evidence would show later incidents gave Missakian pause. In March 2011, he discovered a different version of his draft agreement with changes so egregious he would not have accepted employment on the terms outlined. Alevy assured Missakian that the version he had just seen was a mistake. Later, Missakian wanted to make sure "Alevy is going to follow through on his word and honor the parties' agreement about the compensation,"

32

but it became clear to Missakian that Alevy and Amusement were not going to pay the Stern Litigation Bonus, and he eventually left Amusement and accepted different employment, with a drop in pay.

Amusement's opening statement focused on the theory that there was never a meeting of the minds on the terms of an agreement, and the parties' inability to agree on the terms of a written agreement demonstrated that there was never an oral agreement, particularly with respect to the details of the Stern Litigation Bonus.

Missakian's case-in-chief consisted of testimony by Missakian and three Amusement employees called as adverse witnesses. Two of the Amusement employees testified to making changes to the draft agreement, but there was no testimony that anyone other than Alevy made any promises on behalf of Amusement to Missakian before he started working there in early December 2010.

After the close of Missakian's case-in-chief, Alevy's attorney moved for non-suit, arguing that there was no evidence Alevy had any intent to defraud Missakian when he made the offer of employment. The court denied the motion, noting that "plaintiff's theory is he was offered certain terms and he took the job based on the terms offered."

At the start of defendants' case, Alevy's attorney made an opening statement emphasizing that the case was very simple; it concerned a lawyer who did not get an agreement in writing so it would be clearly understood by both sides. Instead, there was a misunderstanding. Missakian blew up and decided to leave, but the decision to leave was his own. The defendants presented testimony from three Amusement employees, as well as video

33

testimony from Missakian's deposition. Missakian offered brief rebuttal testimony from himself and a former Amusement attorney.

In closing argument, Missakian's attorney reminded the jurors of the questions posed at the outset of the case, including whether "Mr. Allen Alevy on behalf of himself and also for Amusement, did they make promises to Mr. Missakian that the defendants did not intend to keep?" Alevy's closing argument focused on the fact that Missakian claimed to have entered into a handshake deal with Alevy on October 27, 2010, but then the parties continued to negotiate afterwards. On the fraud claim, Missakian learned in March 2011 that there was a materially different draft agreement, but he continued working until August 2014 and did not sue until April 2016. Despite his training and education, Missakian did not clarify the details of the parties' agreement in writing, but Alevy's proposed edits showed he consistently considered the Stern Litigation Bonus to be based on the net recovery, meaning it would be calculated after expenses were deducted. The negotiations demonstrated that Alevy never thought that he would defraud Missakian, but that he only expected to pay the Stern Litigation Bonus net of the $13 million Amusement had lost. Amusement's closing argument followed similar themes, emphasizing that there had been no meeting of the minds on the terms of an agreement, and that Alevy had insisted on the term "net" from the first written draft.

Missakian gave his own rebuttal closing argument, painting himself as a talented, hardworking litigator who successfully turned the Stern Litigation around, while Alevy and other Amusement employees were making changes to the draft

agreement in the shadows.  While Amusement claimed there was a misunderstanding about changes to the terms of the agreement, the jury never heard from Alevy, and the changes revealed the company's false intent, because Alevy never used the term "net profit."

### b.  Jury instructions

Most of the jury instructions were taken from the Judicial Council of California Civil Jury Instructions (CACI).  The court gave CACI No. 1902 (false promise), referring to the defendants collectively in the introduction and as to each element.  The introduction started: "Mr. Missakian claims he was harmed because defendants Amusement and Mr. Alevy ("Defendants") made a false promise."  Then each element also referred to "Defendants" collectively.

For CACI No. 3948 (Punitive damages – individual and corporate defendants [corporate liability based on acts of named individual] – bifurcated trial [first phase]), the instruction addressed Alevy's individual liability and then Amusement's corporate liability.  The first paragraph stated, "If you decide that Mr. Alevy's conduct caused Mr. Missakian's harm, you must decide whether that conduct justifies an award of punitive damages against Mr. Alevy and, if so, against Amusement."  For Alevy, the court instructed, "You may award punitive damages against Mr. Alevy only if Mr. Missakian proves by clear and convincing evidence that Mr. Alevy engaged in that conduct with malice, oppression, or fraud."  After defining those terms, the instruction continued,: "You may also award punitive damages against Amusement based on Mr. Alevy's conduct if

35

Mr. Missakian proves one of the following by clear and convincing evidence. . . ." The instruction went on to describe different scenarios where Alevy's conduct resulted in harm to Missakian.

### c. Initial special verdict

The jury's special verdict responses on the contract claim found that Amusement had breached the Oral Contract and failed to pay the Stern Litigation Bonus and the Monthly Bonus.[15] The jury awarded Missakian combined breach of contract damages of $2,525,000.

On Missakian's promissory fraud claim, the jury's responses on the initial special verdict form were ambiguous. The jury found defendants Alevy and Amusement intended to perform the promise, meaning Amusement and Alevy were not liable for promissory fraud, but the special verdict instructions still permitted the jury to make findings on the availability of punitive damages.[16] In response to the punitive damages

---

[15] The parties initially submitted competing special verdict forms, but came to agreement on a joint form at the court's direction.

[16] After answering yes to the first question ("Did defendants make a promise to Mr. Missakian?"), the jurors were correctly directed to continue to question two. But when they answered yes to the second question ("Did defendants intend to perform this promise when they made it?"), the instructions incorrectly directed the jury to continue to question three, about whether defendants intended for Missakian to rely on the

36

question "Has [Missakian] proved by clear and convincing evidence that Defendant(s) Amusement Industry, Inc. and/or Allen Alevy acted with malice, oppression and/or fraud?" the jury answered "yes" as to Amusement but "no" as to Alevy.

### d. Revised special verdict

At a conference outside the presence of the jury, Missakian asked the court to use a revised special verdict form in light of the instructional error and the inconsistency between the jury's responses on promissory fraud and punitive damages. The attorneys for Amusement and Alevy objected, arguing that a revised form was unnecessary because the jury's responses made it clear that they found no promissory fraud. The attorneys further argued that the availability of punitive damages was a legal question that made the jury's response on malice, oppression, and fraud irrelevant. Alevy's attorney also argued that the jury's responses had exonerated Alevy entirely.

---

promise. The instructions should have directed the jury to stop upon affirming that defendants intended to perform on the promise made, and only continue to subsequent questions upon finding that defendants did not intend to perform. A similar transposing of the directions for yes and no answers appeared in the instructions following question five ("Did defendants perform the promised act?"): when the jury answered "no," they were instructed to stop, rather than instructed to continue on to question six about harm. On the initial form returned, the jury did not enter any responses to the questions about the compensatory damages incurred by Missakian on the promissory fraud claim. Regardless of the jury's responses on the promissory fraud claim, the verdict form also permitted the jury to answer a special verdict on punitive damages.

37

The court decided to have the jury complete a revised form. As the jury was returning to the courtroom, and while changes were being made to the special verdict form, Alevy's attorney pointed out that the special verdict form did not separate the two defendants on the promissory fraud claim, Amusement and Alevy. Missakian agreed to separate revised verdict forms for each defendant. The court denied Alevy's oral motion for a mistrial, but acknowledged that the court and the parties together bore responsibility for providing proper special verdict forms and the court should have scrutinized the initial form more closely. Over objections by Amusement and Alevy, the court instructed the jury to complete the revised special verdict forms for promissory fraud and punitive damages only.

The jury's responses on the revised special verdict forms found in favor of Alevy but against Amusement on Missakian's promissory fraud claim and on punitive damages. Responding to the first two questions on the promissory fraud claim against Alevy, the jury found Alevy made a promise, and Alevy intended to perform the promise when made. In contrast, the jury found that Amusement made a promise, but that Amusement did not intend to perform the promise when made. On punitive damages, the jury again found that Missakian had proven malice, oppression, and/or fraud as to Amusement, but not as to Alevy.

### 3. Analysis

Missakian and Amusement each contend that the jury's special verdict responses mandate that judgment should be entered in their favor and against the opposing party on the

38

promissory fraud claim.  Exercising de novo review, we find the special verdict responses to be inconsistent.  Because the law does not permit a court to choose between two inconsistent responses, we conclude the trial court erred by granting JNOV in favor of Amusement based on the jury's special verdict response as to Alevy.  We remand the case for a new trial.

### a. The special verdict was inconsistent

The jury's responses on the revised special verdict forms— that Amusement made a false promise, but Alevy did not—are contradictory on a material issue.  From opening statements, through the presentation of evidence, closing arguments, and jury instructions, Missakian presented, and defendants contested, only a single theory of the case: that Alevy, acting for himself and as Amusement's agent, made the promise upon which Missakian relied.  (*Fuller, supra,* 38 Cal.App.5th at p. 1038; *Singh, supra,* 186 Cal.App.4th at p. 358.)  While evidence of what other Amusement employees said and did both before and after Missakian and Amusement reached an oral agreement may have provided some circumstantial evidence of Amusement's intent, it does not negate the inconsistency at the heart of the jury's special verdict responses.  Missakian framed the case solely on Alevy's promises, and never argued to the jury that Amusement made any misrepresentations through anyone other than Alevy.  The jury made inherently inconsistent factual findings at the core of the promissory fraud case in returning a special verdict that Amusement made a false promise, but that Alevy did not.

Missakian contends the jury's two opposing findings should be reconciled.  He argues that the words and actions of other Amusement employees supported the jury's finding that Amusement *did not* intend to keep its promise, even though the jury also found that Alevy *did* intend to keep his promise. (*Hasson, supra*, 19 Cal.3d at pp. 540–541.)  The argument is flawed in two ways.  First, the obligation to reconcile opposing findings in order to preserve the jury's verdict "applies only to inconsistencies between general and special verdicts, and inconsistencies between special findings rendered in support of a general verdict." (*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303; *Trejo, supra*, 13 Cal.App.5th at p. 124, fn. 5.)  Here, we are determining whether two special verdict responses are inconsistent.  "With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict." (*Singh, supra*, 186 Cal.App.4th at p. 358.)

Second, as described above, Missakian's argument is at odds with the pleadings and theory of the case reflected in counsels' arguments and the jury instructions.  (*Fuller, supra,* 38 Cal.App.5th at p. 1038; *Singh, supra*, 186 Cal.App.4th at p. 358.)  The possibility that Amusement's promise and intent would be different than Alevy's promise and intent was never contemplated by the parties and their attorneys, nor was that possibility mentioned in the pleadings, trial briefs, opening statements, or closing arguments to the jury.  In fact, the initial special verdict form referred to defendants collectively, such that it was not contemplated the jury would even have the opportunity to make different findings for Amusement and Alevy.  Only in the midst of deliberations, after unrelated

40

problems arose with the special verdict form, did Alevy's attorney request that the verdict form be split between the two defendants. This request was made in an apparent attempt to insure Alevy's non-liability for punitive damages. This revision to the special verdict form did not transform the case from the sole factual theory on which it had been tried.

Amusement also contends the trial court's grant of its JNOV motion should be affirmed because there was no substantial evidence to support a promissory fraud judgment against Amusement. But Amusement's framing of its argument in the guise of a substantial evidence claim is disingenuous: to argue no substantial evidence, Amusement necessarily relies on the trial court's decision to accept the verdict against Alevy over the verdict against Amusement. Explaining its reasoning for granting Amusement's JNOV motion, the trial court credited the jury's response that Alevy had not misrepresented his personal intent to carry out the promises made. Accepting this finding, the trial court then reasoned that, since Alevy was the only person alleged to have made the representations on which Missakian had relied, Amusement could not logically be held liable for promissory fraud. The trial court stated: "If Alevy did not make a false promise, as the jury found, whatever reliance [Missakian] had was not based on anything false." Because a court cannot choose between two inconsistent special verdicts, Amusement's reliance on the trial court's reasoning to make its substantial evidence argument only serves to highlight the inconsistency between the two special verdict responses.

Reviewing the evidence, opening statements, closing arguments, and jury instructions, we conclude there is no way to resolve the inconsistency between the two findings. In light of

41

this material inconsistency, it was an error for the trial court to credit the jury's finding as to Alevy and rely on that aspect of the verdict to grant JNOV in favor of Amusement. Amusement was "no more entitled than [Missakian] to have the favorable verdict credited and the unfavorable one disregarded." (*Shaw, supra,* 83 Cal.App.4th at p. 1346.)[17] Where findings on material issues conflict, a special verdict cannot stand. (*D.R. Horton, supra*, 126 Cal.App.4th at p. 682.) "'An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict [citation] or irreconcilable findings . . . . [Under those circumstances,] all the questions are equally against the law.'" (*Trejo, supra*, 13 Cal.App.5th at p. 124.)

### b. Based on the inconsistent special verdict, a new trial is warranted

Alevy contends that by choosing not to seek a new trial under Code of Civil Procedure section 659, Missakian waived any retrial against Alevy. However, "'[a] motion for a new trial is not, generally, a condition precedent to an appeal. Generally speaking, any error of law can be raised on an appeal even though a motion for new trial has not been made.'"

---

[17] Alevy contends that *Shaw, supra,* 83 Cal.App.4th at page 1347, supports the argument that the jury's finding of non-liability as to him personally precludes a finding of liability as against Amusement. While that may be true in a case involving a general verdict, as was the case in *Shaw*, the same principle does not apply when a jury has rendered inconsistent special verdicts, as they have here. (*Ibid.*, fn. 4 [unappealed general verdict in favor of employee defendant on defamation claim supports reversal of defamation claim against employer].)

42

(*Mendoyama, Inc. v. County of Mendocino* (1970) 8 Cal.App.3d
873, 878.)  Here, Missakian appeals the validity of the judgment,
and our de novo review finds the special verdict responses to be
inconsistent.  Our determination that the findings were
inconsistent makes both special verdict responses invalid.  (See,
e.g., *Zagami*, *supra*, 160 Cal.App.4th at p. 1094 [when two
findings are inconsistent, both are equally against the law].)
Missakian adequately preserved a new trial against Alevy, as
well as Amusement, by appealing from the defective judgment.
(*Morris v. McCauley's Quality Transmission Service* (1976) 60
Cal.App.3d 964, 973 [despite no motion for new trial, ordering
new trial after finding inconsistent verdicts].)[18]

Because we find the special verdict responses are
inconsistent, *both* special verdict responses—the one against
Amusement and the one in favor of Alevy—are invalid, and
Missakian's claims against both defendants are subject to a new
trial.

## C. Alevy's motion for attorney fees

Based upon Alevy having prevailed in the trial court on
the sole cause of action against him (i.e., promissory fraud),
Alevy appealed the trial court's denial of his motion for attorney
fees under Civil Code section 1717 and Code of Civil Procedure

---

[18] Alevy asserts, without authority or elaboration, that
Missakian's selection of the jury's award of contract damages
over the lower promissory fraud and punitive damages award
precludes a retrial on the promissory fraud claim.  We reject this
unsupported assertion.

section 1021. Our reversal of the judgment and remand of the matter for a new trial renders Alevy's appeal moot.

## DISPOSITION

The judgment is reversed, and the case is remanded for a new trial as to all parties. In the interests of justice, each party shall bear their own costs on appeal.

MOOR, J.

I concur:

EGERTON, J.*

_____

* Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

### *Missakian v. Amusement Industry, Inc. – B296749*

RUBIN, P. J. – Concurring:

I agree with the result the majority opinion reaches. I write separately only to urge that the opinion be read narrowly, confined for the most part to facts similar to the present case. The majority's analysis, although undoubtedly correct when applied here, should not be interpreted as a blanket rule that governs all in-house attorney arrangements. There are many corporate counsel relationships that, in my view, are not subject to Business and Professions Code section 6147.

It is fairly non-debatable that in-house counsel are on the same footing as their outside retained counterparts, at least for most purposes. For example, the attorney-client privilege itself applies. "The privilege protects communications between legal professionals within the law firm representing the client (*Fireman's Fund Ins. Co. v. Superior Court* (2011) 196 Cal.App.4th 1263, 1273–1274), communications between a business entity and its in-house counsel acting in a legal capacity (*Alpha Beta Co. v. Superior Court* (1984) 157 Cal.App.3d 818, 825), and communications made during preliminary consultation, regardless whether the attorney is ultimately retained. . . ." (See *Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1099.) As our Supreme Court has unequivocally stated, "We reject any suggestion that the scope of the privilege should be diluted in the context of in-house counsel and their corporate clients. Members of corporate legal departments are as fully subject to the demands of the privilege as their outside colleagues." (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1190.)

I also agree with the majority that in-house counsel are attorneys for purposes of determining an award of statutory or contractual attorney's fees.  (See *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1093.)  And, I agree that in-house counsel should be treated the same as retained outside counsel for the attorney fault provision in Code of Civil Procedure section 473.  (See *Gutierrez v. G & M Oil Co., Inc.* (2010) 184 Cal.App.4th 551, 554–557.)  These holdings fit comfortably within the purposes of the applicable statutes and contractual principles.

But I see substantial differences in salary/compensation to in-house counsel, on the one hand, and contingency fee compensation based on success or failure in standalone litigation, on the other.  The reasons are fairly self-evident.  As our Supreme Court has stated plainly:  "A private corporation with an office of general counsel and a large corporate legal staff is not in any material sense analogous to the personal injury plaintiff of limited means who seeks representation in a single matter."  (*General Dynamics Corp. v. Superior Court*, *supra*, 7 Cal.4th at p. 1178.)

It is precisely that difference that requires a narrow reading of the majority's opinion.  Its holding should not be treated as an invitation to meld the diverse types of compensation available to in-house counsel with the free-standing contingency agreement often found in personal injury representation.  A fair reading of the record here is that Amusement hired Missakian to handle two related pieces of litigation (the *Stern* litigation) and as part of his compensation Missakian was to receive "a bonus equal to 10% of any and all sums recovered in the [*Stern* litigation] or related matters less"

2

certain other fees and costs. To be sure, this initial interest developed into an agreement to act as in-house counsel. But from the outset of Missakian's employment as Amusement's counsel, part of his compensation was contingent, as that term is used in Business and Professions Code section 6147. That fact is not insignificant. Business and Professions Code sections 6147 and 6148 were "enacted to benefit and protect clients, such as the one sued by attorney here, *by informing them at the outset of the representation* in a signed writing, inter alia, of the amount of attorney fees they will incur under fee for service and contingency fee agreements. (*Chodos v. Borman* (2014) 227 Cal.App.4th 76, 101–102 (*Chodos*); italics added.)

I do not suggest that the timing of the contingency fee arrangement alone is dispositive. Nevertheless, that the percentage arrangement here was reached at the inception of the attorney-client relationship is a significant factor in my agreement with the majority that section 6147 applies.[1]

---

[1] The timing of a percentage fee arrangement is a factor, and not an unimportant one. In *Chodos* the court found the client's failure to execute a contingency fee agreement while litigation was pending was a factor in its conclusion to reduce a quantum meruit jury award. *Chodos* did not involve in-house corporate counsel; plaintiff had represented his client in two divorce actions and one related lawsuit. (*Chodos*, *supra*, 227 Cal.App.4th at p. 82.) *Chodos* was properly decided but it is not particularly helpful factually to the present appeal. As a corollary to *Chodos*, I agree that generally section 6147 would invalidate an oral modification of a written contingency fee agreement covered by the statute.

3

The contingency fee agreed upon at the incipiency of the attorney-client relationship here is a factor that distinguishes the present case from those involving long standing employment relationships that regularly or periodically include percentage-based compensation, I give as examples: (1) the previously hired in-house counsel without a written employment agreement who one year is promised by the company that, if he or she is successful in reducing the amount of attorney's fees charged the company by outside counsel, the company will pay the in-house lawyer a 10 percent bonus based on the reduced amount of fees; and (2) in-house counsel, also without a written agreement, who is directed to represent the company as a plaintiff in litigation and is promised, in addition to regular salary, 10 percent of any recovery.

There are many other compensation structures that experienced in-house counsel could imagine. To insist that those attorneys already hired must ask their employer for a written agreement covering percentage compensation is unrealistic and likely to invite mischief. Nor is it in keeping with the language or the policies of Business & Professions Code section 6147. I see the present case sufficiently different from the examples I have given, and, for that reason, I concur.

RUBIN, P.J.

---

Ultimately, it is the totality of the circumstances of the attorney-client relationship – not just the inclusion of a contingency element – that, in my view, determines whether section 6147 should apply in the in-house counsel setting.